## APPEAL OF HANFF-METZGER, INC.

Docket No. 5079. Decided September 30, 1926.

1. Personal service classification denied.
2. The action of the Commissioner in including in gross income $6,828.44, a portion of a reserve for advertising short rates, approved.

*Clarence L. Johnson, C. P. A.*, for the petitioner.
*J. Arthur Adams, Esq.*, for the Commissioner.

This is an appeal from the determination of a deficiency in income and profits taxes in the amount of $20,764.74 for the calendar year 1919. The taxpayer claims that the Commissioner erred (1) in refusing to allow it classification as a personal service corporation, and (2) in adding to gross income $6,828.44, a portion of a reserve for advertising short rates.

### FINDINGS OF FACT.

The taxpayer is a New York corporation having its principal office in New York City. It was organized in 1913 and is engaged in conducting the business of an advertising agency.

The original issue of capital stock was $25,000, which was paid in in cash. On January 1, 1919, the outstanding stock amounted to $50,000. On December 21, 1919, the outstanding stock amounted to $300,000, consisting of 3,000 shares of a par value of $100, the percentage held by the several stockholders being as follows:

|  | Per cent. |
|---|---|
| Joseph A. Hanff_____ approximately__ | 34 |
| Joseph P. Metzger_____do____ | 34 |
| A. O. Dillenbeck_____do_____ | 16 |
| D. M. Jones_____do____ | 6½ |
| Arthur De Cossey_____do_____ | 6½ |
| L. J. Seeger_____ | 3 |
| C. J. Atkinson_____ | 2 |

The increase of $275,000 in capital stock was issued to represent good will. The stock issued to Jones, De Cossey, Seeger and Atkinson was given them by the taxpayer for their cooperation.

All of the stockholders devoted their entire time to the business of the taxpayer. Hanff, Metzger, and Dillenbeck were the directors and executives of the company. They directed the work of the taxpayer and principally made the contracts with advertisers.

Seeger was the treasurer, Atkinson had charge of sending out orders, and De Cossey was in charge of executing the art ideas.

The business of the taxpayer originated for the most part from contact between one of its executives and a prospective client and to some extent through the employment of solicitors. After a contact was made, it was customary for the taxpayer to make a thorough survey and analysis of the advertiser's business, its products, the cost thereof, and the possible market. These factors, and the items taken into consideration in determining them, were reflected in chart form. At times the taxpayer suggested new products which it believed the advertiser could profitably manufacture and market, and prepared and submitted containers and trade-names designed to aid in marketing the advertiser's products.

An example of the taxpayer's method of operation is shown in the case of a firm which, prior to 1919, had made a product for brewers. With the approach of National prohibition this firm found it necessary to put its plant to other uses. It consulted the taxpayer, which, after making a survey of the business possibilities, recommended the manufacture of corn products, such as corn flour, corn meal, hominy grits, and similar foods to which they found the mill could be adapted. The taxpayer then recommended that in this line of goods a leader be adopted which would be advertised extensively and carry most of the line. In order to carry out this idea the taxpayer gave the entire line a distinctive name and designed a series of packages which would make an attractive appearance on grocers' shelves, the package for each product having a different color combination, but all the packages having sufficient similarity to be recognized as belonging to this special group of corn products. The taxpayer wrote all the advertising copy for this firm and assisted its sales manager in the direction of the sales force.

In another case, that of an oil company, the advertiser had two kinds of oil, one a light or golden color and the other a dark oil. About 85 per cent of its sales had been the dark oil, as the public was familiar with oil of that color. The taxpayer, after considering the matter carefully, recommended that the golden colored oil be advertised. This was done, the advertisements of a golden colored stream of oil becoming the means of introducing a distinctive product, with the result that within three years the sales of the company's oils had not only increased greatly, but 85 per cent of the company's business was the sale of the golden colored oil.

After an advertising campaign had been prepared and the mediums of advertising selected by the taxpayer, the advertisers would either indorse a schedule of advertising or give the taxpayer a written order. The taxpayer would then contract for space, in the name of the advertiser, with the advertising mediums which had

been decided upon, such as magazines, newspapers, trade papers and billboards. The taxpayer neither owned any advertising mediums nor contracted for space in its own name.

The publishers of the advertising mediums billed the taxpayer for the amounts due on the space used, showing on the bills the space used by each advertiser and the amount due therefor. The publishers usually gave a discount of 2 or 3 per cent for payment within the month in which the bill was rendered, and this discount was allowed by the taxpayer to the advertisers. The publisher usually billed the taxpayer from 12 to 15 days before the discount date, whereas the taxpayer customarily billed the advertisers from 15 to 40 days before that date. The taxpayer was able to do this for the reason that it knew in each case the amount of space contracted for, the publisher's rate per line, and the rate of discount allowed by each publisher. In most cases the advertiser was allowed the discount on the gross amount of the bill, whereas the discount allowed the taxpayer was computed on net amount, that is, the gross amount less the taxpayer's commission of 15 per cent. The commissions allowed the taxpayer by publishers constituted the greater part of its income.

The taxpayer's income and expenses for 1919 were as follows:

| Income. | | Expenses. | |
|---|---|---|---|
| Publication commissions | $152,371.05 | Art department expenses | $2,137.41 |
| Billboard commissions | 10,324.22 | Commissions to solicitors | 11,002.04 |
| Trade commissions | 1,196.87 | Traveling | 3,655.45 |
| Service department | 5,166.22 | Carfares | 624.77 |
| Discounts earned | 20,221.69 | Entertaining | 1,290.80 |
| | | Messenger service | 514.65 |
| | | Telephone | 1,069.02 |
| | | Postage | 1,515.41 |
| | | Expressage | 39.03 |
| | | Business getting | 3,354.77 |
| | | Rent | 6,000.00 |
| | | Payroll | 75,117.93 |
| | | Repairs | 342.89 |
| | | Cleaning | 737.00 |
| | | Stationery | 2,221.32 |
| | | Legal | 746.90 |
| | | Light | 136.22 |
| | | Depreciation on furniture and fixtures | 776.46 |
| | | Depreciation on library | 25.65 |
| | | Customers account written off | 5,037.38 |
| | | Miscellaneous | 2,646.73 |
| | | Discounts allowed | 21,594.63 |
| | | Taxes | 4,902.74 |
| | | Profit for year | 43,790.85 |
| | 189,280.05 | | 189,280.05 |

The item of $152,371.05 listed as publication commissions represents the 15 per cent commissions allowed the taxpayer by publishers, which the taxpayer, in remitting to the publishers, deducted from the payments received from advertisers. The item of billboard commissions represents the taxpayer's commission on advertising placed on billboards. The item of $1,196.87 listed as trade commissions represents the amount received for placing advertising for two hotels. In exchange for the advertising the hotels gave the publishers due bills which were good for trade at the hotels and the publishers paid the taxpayer a 15 per cent commission on the amount of advertising placed with them. The amount of $5,166.22 shown as income from service department is made up of 15 per cent commissions on engraving, electrotyping and other mechanical work handled for advertisers. The taxpayer sent out work of this kind to be done by others and charged the advertisers a commission on the bills rendered. The item of discounts earned represents discounts allowed the taxpayer by publishers for payment of bills within a specified time. The taxpayer always took advantage of these discounts which were figured on the charge for space after deducting the taxpayer's commission.

The item of $11,002.04 shown as commissions to solicitors is the amount paid to persons employed to solicit advertising. They were paid one-third of the commissions on the business they obtained. The item listed as expense for "business getting" represents expenditures for experiments made by the taxpayer which it felt could not properly be charged to advertisers. The payroll expense of $75,117.93 included salaries of officers and stockholders. The amount paid employees who were not stockholders, exclusive of officers and solicitors, was $34,432.93. The taxpayer had about 35 or 40 employees who were not stockholders. Included in this number were the following:

| | Average number. | Salary range per week. |
|---|---|---|
| Contract and forwarding department | 6 | $12—$40 |
| Copy and lay-out men | 3 | 40— 80 |
| Stenographers | 7 | 18— 22 |
| Bookkeeping department | 9 | 11— 30 |
| Telephone and file clerks | 2 | (1) |
| Service men | 2 | (1) |
| Errand boys | 11 | 11 to 15 |

1 Not stated.

The item of discounts allowed represents the amounts allowed advertisers for payment of bills before a specified date. This item is larger than the amount shown in the income column as discounts

earned due to the fact that the discounts allowed advertisers were figured on the amount of the bill before deduction of the taxpayer's commission.

The balance sheets for 1919 were as follows:

| | Jan. 1, 1919. | Dec. 31, 1919. |
|---|---:|---:|
| **ASSETS.** | | |
| Cash on hand | $59. 62 | $104. 03 |
| Cash in banks | 8, 185. 46 | 16, 080. 00 |
| Accounts receivable | 61, 631. 55 | 97, 060. 65 |
| Notes receivable | 219. 00 | 1, 719. 00 |
| Commissions receivable | 579. 52 | |
| Trade investigation advances | 250. 00 | |
| Furnitu e and fixtures | 7, 101. 38 | 6, 988. 12 |
| Library | 256. 57 | 230. 92 |
| Unbilled art and service | 6, 341. 25 | 5, 565. 57 |
| Stationery | 2, 302. 52 | 2, 221. 32 |
| Good will | 25, 000. 00 | 275, 000. 00 |
| Stock subscriptions | 352. 00 | 600. 00 |
| Liberty bonds | 2, 310. 19 | 1, 566. 73 |
| Advances on pay roll (general) | | 928. 77 |
| Advances on pay roll (art department) | | 157. 10 |
| Advances to solicitors | | 9, 474. 43 |
| Total | 114, 589. 06 | 417, 696. 64 |
| **LIABILITIES.** | | |
| Accounts payable advertising | 38, 341. 17 | 61, 466. 38 |
| Accounts payable art and service | 2, 113. 77 | 6, 660. 08 |
| Reserves for short rates | 4, 191. 71 | 11, 235. 26 |
| Reserves for errors | 2, 393. 13 | 6, 134. 26 |
| H. G. Atkinson | 93. 19 | |
| A. O. Dillenheck | 1, 115. 28 | |
| Salaries accrued (general) | 231. 00 | |
| Salaries accrued (art department) | 200. 00 | |
| Capital stock | 50, 000. 00 | 300, 000. 00 |
| Profit and loss surplus | 15, 909. 81 | 32, 200. 66 |
| Total | 114, 589. 06 | 417, 696. 64 |

The accounts receivable in both balance sheets represent amounts billed to advertisers. Notes receivable covers amounts loaned to employees. Commissions receivable of $579.52 is the amount due the taxpayer at that time in a case where the publisher billed the advertiser direct and the taxpayer received its commission from the advertiser. The item of advances to solicitors represents the amounts drawn, but not at that time earned, by persons employed as solicitors. The furniture and fixtures account covers the desks and similar furniture. The account listed as unbilled art and service is the amount due from advertisers on work done, such as drawing, in the preparation of advertising. In most of these cases the taxpayer received payment from the advertisers before paying the artist or mechanic who did the work. The good will shown was entered to increase the capital so as to be in keeping with the dividends. The stock subscription items represent the taxpayer's subscriptions for stock in the Outdoor Bureau and the Advertising Agency Association. The Outdoor Bureau is an organization through which adver-

tising agencies place their billboard advertising and the taxpayer subscribed for stock in order to become a member. The Advertising Agency Association was organized by advertising agents during the World War to assist the Government in its advertising work. The item of Liberty bonds represents bonds purchased by the taxpayer for its employees and for which the employees were permitted to pay on the installment plan.

The "accounts payable advertising" are the amounts payable to publishers for advertising placed by the taxpayer for its clients. The reserves for short rates represent reserves accumulated for the purpose of adjusting the amounts finally. determined to be due upon the completion or termination of contracts. This situation arises from the fact that publishers have a sliding scale of rates for advertising space, granting to advertisers who use a large amount of space a lower rate than those who use a small amount. The publishers billed the advertisers through the taxpayer for space at the rate contracted for, but it sometimes happened that during the contract period the advertisers would use either more or less space than originally contemplated and in such cases an adjustment of rates would be in order. For example, an advertiser might estimate that it would run 6,000 lines of advertising in a certain publication during the year. This amount of space perhaps could not be obtained for as low a rate as could 10,000 lines, so in this situation the taxpayer, in handling the account, would contract with the publisher for 10,000 lines in the name of the advertiser. The publisher would render bills at the 10,000 line rate. The taxpayer would render its bills to the advertiser at the higher, or 6,000 line, rate and remit to the publisher at the 10,000 line rate, placing the difference in the "reserve for short rate account." If at the end of the year the advertiser had used only 6,000 lines, the publisher would render a bill for the difference between the 10,000 line rate contracted for and the higher rate applicable to the 6,000 lines used. This bill would be paid by the taxpayer out of the reserve created. If, on the other hand, the advertiser used the full 10,000 lines, it would be entitled to the lower rate applicable to such space and the taxpayer would refund to it the excess it had paid on the basis of the 6,000 line rate.

In 1919 the taxpayer was a member of the American Association of Advertising Agencies, the Associated Ad Clubs of the World, and the Outdoor Bureau.

The Commissioner denied personal service classification, and added to the taxpayer's gross income $6,828.44, a portion of a reserve for advertising short rates.

OPINION.

MORRIS: We are of the opinion that the taxpayer is not entitled to classification as a personal service corporation. *Appeals of McLain, Hadden, Simpers Co.*, 2 B. T. A. 531, and *Matos Advertising Agency*, 3 B. T. A. 62.

With respect to the item of reserve for short rates, the taxpayer contends that this is not income but an increase in its liabilities. This contention, on its face, is unsound. The funds for which this reserve was created were collected by the taxpayer from its clients as a regular part of its business. There does not seem to have been any distinction made, at the time of collection, in billing clients or otherwise, between the amounts which were admittedly income and the amounts placed in the reserve. As far as the record shows, this segregation of receipts was a voluntary act on the part of the taxpayer, for the purpose of providing funds from which payment could be made upon completion of the contract either to the publisher, if the lower rate had not been earned, or to the advertiser, if all the space contracted for by the taxpayer had been used. The question of the deduction of reserves has been before the Board in a number of cases. In the *Appeal of William J. Ostheimer*, 1 B. T. A. 18, 21, we said:

The revenue laws prior to the 1921 Act have never recognized reserves as being deductible from gross income in determining net income except in the case of insurance companies. * * * The statute specifies what deductions are allowable and, except in the case of insurance companies, no provision is made in the 1918 Act for the deduction of a reserve as such. Items of expense must actually have been paid or liability therefor incurred in order to be deductible under that Act.

See also *Appeals of Consolidated Asphalt Co.*, 1 B. T. A. 79; *Uvalde Co.*, 1 B. T. A. 932; *Morrison-Ricker Mfg. Co.*, 2 B. T. A. 1008.

In *Appeal of Kleeman Dry Goods Co.*, 2 B. T. A. 369, a deduction for a so-called reserve was allowed upon the finding that the amount claimed represented liabilities actually incurred. In the present appeal, the liability on the part of the taxpayer to refund to the advertiser or to make additional payments to the publisher was not incurred until the completion of its contract with each client. No evidence was offered to show what part, if any, of the reserve was attributable to contracts completed or terminated during the taxable year.

*Judgment for the Commissioner.*

PHILLIPS and STERNHAGEN dissent.